**HEY, Rec'r. etc., Plaintiff-Appellee, v. CUMMER, Defendant-Appellant.**

Ohio Appeals, Eighth District, Cuyahoga County.

No. 21404.   Decided December 26, 1950.

**68**

Miller & Hornbeck, Cleveland, for plaintiff-appellee.

Garfield, Baldwin, Jamison, Hope & Ulrich, Cleveland, for defendant-appellant.

## OPINION

By HURD, J:

This action in equity to declare a trust ex maleficio for accounting and equitable relief, is here on appeal on questions of law from a judgment rendered by the Common Pleas Court of Cuyahoga County, in favor of plaintiff-appellee in the total sum of $510,318.05 with interest at six percent from December 29, 1948. The judgment is made up of two principal items, viz., the sum of $150,000.00 with interest at six percent from September 5, 1925, to the date of the judgment, and the sum of $70,303.23, found by the trial court to be secret commissions and profits collected by the defendant, upon which interest is computed from the respective dates on which said sums were found to have been received by the defendant.

This case presents many difficulties on review, because of the complicated questions of fact presented by a record of close to 1400 pages and by a volume of over 100 pages of exhibits concerning real estate transactions which took place in Florida over 25 years ago. Because of the nature of the transactions, there was an obvious and understandable effort and attempt to shroud the movements of the parties in secrecy. This secrecy was deemed necessary because of the proposed venture of The Brotherhood Investment Company, an affiliate of The Brotherhood of Locomotive Engineers to purchase extensive tracts of land in Florida at a time when it was thought by all parties that if it became known through-

out the area in Florida where. the lands were situate, that the Brotherhood Investment Company or any of its affiliates were interested in the acquisition of these lands the result would be a substantial increase in the market prices thereof.

There are many conflicts in the testimony, the case having originated in the Common Pleas Court of Cuyahoga County as a chancery case, whereas the appeal to this Court is on questions of law rather than questions of law and fact. This appeal, however, involves questions of the weight of the evidence as well as questions of law which, because of the nature of the case has required the devotion of considerable time and effort to an examination of the record, the numerous exhibits and an examination of many textual and case authorities.

The case was tried by the common pleas court on the amended petition of the Receiver, who alleges in substance that he is the duly qualified and acting Receiver of the Brotherhood Investment Company, an Ohio corporation; that in the year 1925, the defendant was employed by the Brotherhood Investment Company as a confidential and trusted agent to negotiate for and purchase certain parcels of real estate in Sarasota County, Florida; that in the performance of his duties, the defendant did negotiate for the purchase of said parcels and the same were purchased by the Brotherhood Investment Company at prices negotiated by the defendant, and in consequence thereof the Brotherhood Investment Company acquired title to said parcels and caused the same to be conveyed to the Brotherhood Realty Company, a subsidiary corporation; that in payment for his services as such confidential representative, The Brotherhood Investment Company paid to defendant the sum of $190,600.00.

It is further alleged that the defendant fraudulently and in violation of his duties as such confidential representative received secret profits and commissions from the sellers of said parcels and from agents through whom said purchases were made and that defendant wrongfully, fraudulently and unlawfully included these secret profits and commissions within the purchase prices paid by his principal for said properties and failed and neglected to pay the same to his principal or to account to his principal in any manner for the same and thereby wrongfully withheld the same from his principal.

It is further alleged that the plaintiff does not know, and cannot determine the various amounts wrongfully and fraudulently received by the defendant and withheld by him and that the plaintiff, or the Investment Company did not have any knowledge whatsoever of the so-called secret profits and

commissions prior to one year from the institution of the action which was originally commenced by petition May 23, 1941.

The plaintiff further alleges that he is without adequate remedy at law and prays for an order directing the defendant to disclose and divulge to plaintiff all of the details and information relative to all sums of money received by him from any and all sources whatsoever in any way relating to the purchase of said land or the negotiations therefor; that the defendant be declared to be a trustee ex maleficio for all sums received by him from any and all sources whatsoever in respect to the acquisition of said lands or the negotiations therefor; that the defendant be ordered to hold all said sums for the use and benefit of the plaintiff; that the defendant be ordered to render to plaintiff an accounting for all of said sums and matters, and that the plaintiff may have such other and further relief as may be just and equitable in the premises.

To the amended petition, the defendant filed an answer setting forth four separate defenses and a cross-petition praying for affirmative relief against the plaintiff.

The first defense sets forth in substance that he was employed by the Brotherhood Investment Company in the year 1925, as an agent to negotiate for, and to purchase a single parcel of real estate in Sarasota County, Florida, generally known and referred to as the "Albee Parcel;" that in the performance of his duties he did negotiate for the purchase of the said "Albee Parcel"; and that the same was purchased by the Investment Company at the price negotiated by the defendant and in consequence thereof the Investment Company acquired title to said parcel and conveyed the same to the Brotherhood Realty Corporation; that in payment for his services in connection with the purchase of said parcel, the Investment Company paid to the defendant the sum of $150,000.00.

For his second defense, the defendant alleges in substance that the cause of action of plaintiff or his predecessor in interest accrued to him or them more than four years before the filing of the petition in this cause and therefore is barred by the statute of limitations.

For his third defense, the defendant says that if it should be found that he was employed by the Brotherhood Investment Company as agent to negotiate for and/or purchase parcels of real estate other than the "Albee Parcel" and that he received for said services any payments from the Investment Company and that he did receive for said services a profit and commission from certain sellers of parcels of real

estate other than the "Albee Parcel" to the investment Company (all of of which he specifically denies) then, and in that event, he avers that the executive officers and executive committee of the board of directors of the Investment Company knew of the payment of such profits and/or commissions, if any, to this defendant, prior to their payment to this defendant, and said officers and committee ratified, confirmed and approved, consented to and acquiesced in such payments of profits and/or commissions, if any, to the defendant.

For his fourth defense, the defendant alleges that subsequent to the payment of any of the sums or amounts paid by the Investment Company to this defendant, plaintiff accepted stock of a certain Florida corporation known as The B. L. E. Realty Company, a wholly owned subsidiary, incorporated by the Investment Company for its benefit, in order to accomplish the acquisition and sale of land in Florida, and by the amount of the declared value of such stock reduced the amount paid out or disbursed for the acquisition of land at Sarasota County, Florida, including any amounts paid to the defendant; that subsequently the Investment Company sold said stock of the Realty Company to one or more purchasers at a price equal to or in excess of the total amount advanced by the Investment Company, on account of the acquisition of land in Sarasota County, Florida, and/or to the Realty Company including the amounts paid or advanced to this defendant; that by virtue of the foregoing, any claim of this plaintiff against this defendant was paid, satisfied and discharged, and/or this plaintiff or his predecessor, the Investment Company, suffered no pecuniary damage or injury by virtue of the facts set forth in the petition.

For his fifth defense, the defendant alleges in substance that subsequent to the purchase of the "Albee Parcel" and to the payments to him of commissions for services in connection therewith in or about June, 1925, he entered into an agreement with the Investment Company under the terms of which he was to act as real estate counsel for the Investment Company, so as to give it advice and assistance in order to aid it in the development and disposal of the real estate purchased by it in and around the town of Venice, Sarasota County, Florida; that said agreement provided further that said defendant was not required to take an active part in the business of the Investment Company, but was solely to hold himself available for all assistance in the way of advice and counsel for which he might be called upon; that said agreement further provided that in payment for such services the Investment Company agreed to pay to him an over-writing

commission on the gross sales of land in Sarasota County, Florida, made by it or any subsidiary corporation owned or controlled by it, in the amount of five percent of all such sales; that said agreement further provided that either the defendant or the Investment Company could cancel said agreement upon the payment to defendant of the sum of $100,000.00 upon due notice; that subsequently, to-wit, on or about Sept. 5, 1925, said agreement was reduced to writing and executed by defendant and the Brotherhood Investment Company; that the defendant has never received notification from the Investment Company or its successor of intention to cancel said agreement; . that the defendant has done all things necessary upon his part to fulfill and complete the undertakings and promises made by him in said agreement; that he still remains available for assistance by way of counsel and advice for which he may be called upon for the development and disposal of said properties:

The defendant further alleges that thereafter, at the request of the Investment Company, this defendant consented and agreed to apply the commissions or profits, if any, received by him from sales to the Investment Company of property other than the said "Albee Parcel" to the payment of the amounts due him from the Investment Company by virtue of said contract providing for an overwriting commission of five percent.

For his cross-petition, the defendant alleges in substance the agreement above described in the fourth defense with a repetition of the allegations in respect thereof, and with the further allegations that neither the Investment Company, nor its successor, nor the plaintiff, has ever paid or offered to pay any part of the sums due the defendant by virtue of said agreement; that there are now due and owing defendant large sums of money which plaintiff has refused to pay; that on or about April 11, 1935, he filed a demand with the plaintiff receiver, for his claim under said agreement and that on or about April 19, 1935, the receiver rejected said claim. That he does not know and cannot determine except from record books and documents and other papers in the total control of plaintiff, the total amount of gross sales made by the Investment Company and its subsidiaries and their successors of lands owned by them in and about the town of Venice, Sarasota County, Florida, and that he cannot, without intervention of the court, determine the amount of said sales. The defendant then prays for an accounting to him of the gross amount received by the Investment Company. its subsidiaries and their successors, or the plaintiff, from the sale of lands

owned by the Investment Company, its subsidiaries or successors or the plaintiff in Sarasota County, Florida; that judgment be entered against the plaintiff in the amount of five percent of the gross amount received by the Investment Company, its subsidiaries, their successors or the plaintiff from said sales; together with interest thereon from the date of each of said sales; that plaintiff be directed by the court to pay such judgment from the proceeds of said receivership in the proper priority to which it may be entitled and for such other and further relief as he may be entitled to receive either in law or in equity.

To the answer and cross-petition of the defendant the plaintiff filed a reply and answer traversing the affirmative allegations set forth in the answer and cross-petition and setting out certain averments which it is unnecessary to describe at this point.

On this state of the pleadings, the issues were submitted for adjudication and after weeks of trial the court rendered judgment in favor of the plaintiff on his petition in the total sum hereinbefore set forth. The trial court also found that the defendant was not entitled to recover upon his cross-petition and the same was dismissed at defendant's costs, to all of which defendant excepted and has filed his appeal to this court on questions of law only.

In the interest of clarity and brevity, the parties will hereafter be designated as plaintiff and defendant as they appeared in the trial court. The Brotherhood Investment Company will be designated as the Investment Company, and the Brotherhood Realty Company, or B. L. E. Realty Company, as the Realty Company.

While there are six grounds of error assigned on this appeal these grounds of error can be reduced to four principal questions, as follows:

1. Is the action barred by the statute of limitations?
2. Is plaintiff the proper party to prosecute this action?
3. Was there a breach of any fiduciary relationship?
4. Is defendant entitled to recover on his cross-petition?

It would be very difficult, if not impossible, in the proper bounds of an opinion, to make even a condensed statement of the evidence presented by the voluminous record but before proceeding to a discussion of the questions involved we deem it advisable to advert to certain evidence adduced at the trial as shown by the record and certain findings of the trial court which have a direct bearing on our consideration of the grounds of error urged on this appeal.

While the record does not disclose written conclusions of

fact found separately from conclusions of law as authorized by §11421-2 GC, the trial court filed a written opinion setting forth certain findings of fact in support of the judgment which, because this appeal is on law only, are highly important for consideration by this court on review.

It will be observed upon analysis of the pleadings that the defendant alleges that the sum of $150,000.00 paid to him by the Investment Company on Sept. 5, 1925, was for services rendered by him in procuring the option of the so-called "Albee Parcel" of land located in Sarasota County, Florida. This parcel later became known as the "Venice Town Site" and was the first land optioned in Florida by the Investment Company, the option being for a total purchase price of $1,025,000.00. Issue was joined on this question by plaintiff's reply and the answer to defendant's cross-petition and by the evidence adduced at the trial.

The plaintiff contended that the Investment Company employed the defendant, and paid to him the sum of $150,000.00, as its confidential, trusted and secret agent for the acquisition of certain lands known as the Knight, Price, Palmer, Polakow and Honore tracts and other parcels commonly called the "back country." The evidence was in sharp conflict on this issue. The evidence of plaintiff was directly in support of the allegations contained in his pleadings but the evidence presented by defendant was that the payment of $150,000.00 related exclusively to service rendered by him in securing the option on the "Albee Parcel" for $1,025,000.00, this being claimed as a reduction from the original asking price of $1,500,000.00.

In this connection it should be noted that Dr. Albee, the owner of the Albee Parcel and a witness for the plaintiff, when questioned as to what, if anything, defendant had to do about inducing him to sell his property to the Investment Company, laconically replied, "nothing." Dr. Albee further testified that during his negotiations with George T. Webb, executive vice-president of the Investment Company for the purchase and sale of this property, the defendant did not take part in the negotiations and that he had nothing whatsoever to do with the sale of his property to the Investment Company.

The trial court found from the evidence in favor of plaintiff and against the defendant on this issue, and we cannot say that the finding of the trial court was contrary to the manifest weight of the evidence, there being credible evidence to support this finding of fact.

Therefore, according to well established principles of law, this finding of the trial court must be sustained by this court in our consideration of this and other related issues presented for our determination on this review.

This finding of fact is important to all the questions at issue because it is the contention of the plaintiff that the conduct of the defendant in the acquisition on the "back country" while he was in the employ of the Investment Company was tainted with fraud to such an extent that the plaintiff was entitled to the recovery prayed for in his petition.

We proceed now to a consideration of the first question above stated, namely, "Is the action barred by the statute of limitations?"

The answer of defendant pleads as a second defense that the plaintiff's cause of action accrued, if at all, more than four years before the filing of the petition and for this reason the action is barred by the applicable Ohio statute of limitations,—§11224 GC, which reads as follows:

"An action for either of the following causes shall be brought within four years after the cause thereof accrued:

"1. For trespassing on real property;

"2. For the recovery of personal property, or for taking or detaining it;

"3. For relief on the ground of fraud;

"4. For an injury to the rights of plaintiff not arising on contract nor hereinafter enumerated.

"If the action be for trespassing underground or injury to mines or for the wrongful taking of personal property the causes thereof shall not accrue until the wrongdoer is discovered; nor if it be for fraud, until the fraud is discovered."

It is the contention of defendant that the action is barred whether the court determined that the cause is covered by sub-section 3 or sub-section 4 above quoted.

It is plaintiff's contention that the action is clearly one for relief on the ground of fraud and hence that sub-section 4, §11224 GC has no application. It is further contended by plaintiff that the fraud was not discovered until some time in the year 1940 and that the action was brought within four years of the time of the discovery of the fraud and that this alleged fraud was not discovered until depositions were taken in a lawsuit entitled, May M. Blackburn v. Wimmers Receiver, being case No. 4121 then pending in the Circuit Court of the Twelfth Judicial Circuit of Florida, in and for Sarasota County.

In the trial of the case former officers, directors or employees of the Investment Company testified concerning their

knowledge of the transactions complained of in the plaintiff's petition. The official positions of these witnesses in relation to the Investment Company during the years 1925 and 1926 are important in considering this question. The persons and their positions held at that time are as follows:

Geo. T. Webb, executive vice-president and member of the executive committee; L. G. Griffing, vice-president, member of the executive committee and chairman of special committee of the board of directors sent to Florida to manage the land venture on the ground; Charles E. Lindquist, secretary, member of the executive committee and member of the special committee headed by Mr. Griffing; Alvanley Johnston, member of the board of directors and Joseph A. Hey, bookkeeper-auditor and present receiver.

These five men testified concerning their knowledge of transactions with defendant in connection with his employment as agent for the Investment Company.

In respect of the purchase of the outlying lands it appears from the evidence that Mr. Webb requested defendant to attend a meeting of the board of directors of that company which took place on or about July 1, 1925 in Cleveland and at this meeting a discussion was had concerning the possibility of acquiring for the Investment Company or some Florida corporation to be formed by the Investment Company, the lands surrounding the Albee Parcel; that after some discussion, the defendant was asked to go to Florida for the purpose of acquiring the options on this so-called "back country." In accordance with this request and understanding, the defendant went to Florida and met with one Albert Blackburn who agreed with the defendant to assist in procuring options on lands east of the Albee Parcel. The record discloses that in a discussion between defendant and Blackburn it was agreed that defendant would be "protected" in accordance with the "common custom then prevailing in Florida" which custom was described by Blackburn who was one of plaintiff's witnesses, and then active in the Florida real estate market, as follows:

"It was customary at that time for anyone furnishing a purchaser for real estate which a broker was handling, to get a part of the commission or profit."

Mr. Webb testified that he had knowledge of this agreement between defendant and Blackburn, testifying that he "Cummer, came to me and told me that as was the custom in Florida, he would be able to get a considerable deduction which he

could put in his pocket and account to us for it and I told him at the time that inasmuch as he was representing us and that we had made arrangements to pay him substantially for his work that it would be all right for him to get all the commissions he could and credit us on anything he might have owing to him, which he said was all right."

The record shows that Webb and Griffing, both vice-presidents, had knowledge of this arrangement to "split commissions" and that Lindquist, the secretary of the Investment Company, admitted hearing rumors to the effect that the defendant was "getting something" out of the purchase price of the property. So that it appears from the uncontradicted testimony of Webb and Griffing, that they had actual knowledge of this arrangement and approved it. Webb testified further that he had communicated this knowledge to one W. B. Prenter, now deceased, then president of the Investment Company, and it was agreed by Prenter as to these commissions that the same could be credited to anything the Investment Company would owe to the defendant.

The testimony of Alvanley Johnston, then a member of the board of directors, and Joseph A. Hey, their bookkeeper and auditor and the present receiver, was in substance to the effect that they did not have knowledge of the arrangement whereby commissions could be split by the defendant with Blackburn and others, and credited to the account of the defendant. The testimony of Johnston and Hey on this subject is negative in character and does not contradict the positive testimony of Webb and Griffing. The testimony of Lindquist concerning rumors heard by him was of such character as to put him on notice concerning the commissions. In this state of the record it appears to this court that the finding of the trial court that the Investment Company, now represented by the receiver as plaintiff, did not have notice and knowledge of the arrangement to divide the commissions, is contrary to the manifest weight of the evidence. In our opinion the knowledge of the officers of the Investment Company was the knowledge of the company and that in respect of the matter of dividing commissions as distinguished from secret profits, the discovery "provided for by §11224 GC" occurred in 1925 at the time of the transactions in question.

The last paragraph of §11224 GC provides:

"An action shall not accrue until the wrongdoer is discovered nor if it be for fraud until the fraud is discovered."

In our opinion the evidence showing notice and knowledge

of the company through its officers is clear, and convincing. The proposition of the law contended for by the defendant is well supported by Ohio authorities as follows:

10 O. Jur. 761:

"The doctrine of agency that knowledge of an agent obtained in the course of his employment is imputed to the principal, is especially applicable to corporations, as they can only act through their officers and agents and has been frequently applied by Ohio courts in corporation cases."

In Kornhauser, Recr. v. National Surety Co. 114 Oh St 24 (1926) our Supreme Court stated at page 37 and 38:

"The knowledge of the directors and officials was the knowledge of the corporation. Orme & Okey, Recrs. v. Baker, 74 Oh St 337, 78 N. E. 439; First National Bank of New Bremen v. Burns, 88 Oh St 434, 103 N. E. 93; London & Lancashire Indem. Co. v. Fairbanks Steam Shovel Co. 112 Oh St 136, 147 N. E. 329 * * *. It may be questioned whether this knowledge of a director who immediately severs his connection with the corporation, can be imputed to the corporation, the doctrine that the knowledge of directors and officers is the knowledge of the corporation being necessarily predicated upon their association with the corporation after receiving individual notice. Mader, however, remained a director until after June, 1921, when he received notice of this crookedness, until the investigation took place in December and the corporation cannot rid itself of the fact that notice to him was notice to the company."

In the instant case, Webb and Griffing remained with the company for a period of over two years after having knowledge of the agreement which was communicated to the then president of the company and to which all three gave their approval.

It should be. noted that no conspiracy between defendant and the various officers of the Investment Company is alleged in the pleadings and therefore was not an issue in the case. Therefore we must hold that the sums of money received by the defendant by way of split commissions may not be recovered in this action because of the bar of the statute of limitations.

However, the record discloses evidence of facts in relation to secret profits as distinguished from commissions show-

ing that the defendant entered into a secret agreement with Blackburn and one Gill whereby 170 acres of land was acquired by them in the name of Gill at a price of $30,000.00 and re-sold to the Investment Company for the sum of $102,000.00, thereby netting them a profit of $72,000.00, of which amount it is conceded the defendant received a one-third share. This transaction was a secret one and a thorough search of the record does not disclose any evidence that either Webb, Griffing, Lindquist or other officers or directors of the company had any notice or knowledge thereof. Furthermore, it cannot be concluded from the evidence that the agreement to split commissions of which Webb and Griffing did have knowledge and approved, would put them on notice that defendant was in fact acquiring a secret interest adverse to that of his principal, and thereby reaping an unconscionable profit not only for himself but also for two others in cooperation with him at the expense of his principal.

There cannot be any question with respect to the secrecy with which this transaction was carried on, because the defendant testified that he did not disclose to Webb, Griffing, or any of the members of the board of directors of the Investment Company that he, with Gill and Blackburn, was profiting to this extent and in this manner directly contrary to the interests of his principal. On the contrary, the record shows, according to the testimony of Blackburn, that the defendant urged upon both Blackburn and Gill the utmost secrecy concerning his interest. Consequently, we conclude that while the corporation, through its officers, had notice and knowledge and in that sense there was a "discovery" of the transactions with respect to the splitting of commissions, such knowledge, notice and discovery did not extend to the agreement for secret profits here described.

In relation to this transaction, the contention of the defendant that the most that plaintiff can claim from his amended petition and the evidence introduced by him in support thereof is that the defendant was guilty merely of a breach of fiduciary relationship, cannot be sustained.

While it is true that defendant was a fiduciary there was implicit in his advice to his principal respecting the purchase price of the Gill tract, the representation that $102,000.00 was the best price obtainable. This representation was false. Together with his confederates, defendant purchased the property for $72,000.00 less than the principal was required to pay. This was fraud and conduct which is governed by sub-section 3 of §11224 GC, and which cannot be excused on the ground that there was only a breach of fiduciary relationship.

Fraud may be committed by the suppression of the truth by one whose duty requires him to make full disclosure of the facts. **19 O. Jur. 339; 19 O. Jur. 345.** Kilbourne v. Sunderland, 130 U. S. 505, 9 Sup. Ct. 594; Winget v. Rockwood et al 69 Fed. (2d) 326; Bradrich v. Woodward, 148 Kan. 784; Restatement of Law, Agency, Sec. 403; 23 Am. Jur. 853. Ramspeck v. Pattillo, 104 Ga. 772; Farnsworth v. Hemmer, 83 Mass. 491; Napier v. Adams, 160 Ga. 403; Hogue v. Kentucky River Coal Corp. 216 Ky. 51.

In view of this evidence, and the law applicable thereto, it appears that the finding of the trial court must be sustained on the issue of secret profits accruing from the "Joe Gill" transaction, concerning which the plaintiff corporation had no notice or knowledge whatsoever until 1940 when depositions were taken in the case of Blackburn v. Wimmers, Recr. supra.

Therefore, we conclude that the statute of limitations does not constitute a bar to a recovery of the secret profits proceeding from this transaction.

We proceed now to consider the second question stated above, namely, "is the plaintiff the proper party to prosecute this action?"

It is claimed by defendant that under the provisions of §11241 GC that an action must be prosecuted in the name of the real party in interest and that this section of the Code is mandatory; Citing Cox v. Cinn. Traction Co. 32 O. C. A. 47 (1922); **Weidner v. Rankin, 26 Oh St 522.** These cases are of course authority for the proposition stated.

The claim is made by the defendant by way of brief, that the Investment Company did not pay defendant any money and that the Investment Company did not take title to or have any legal or equitable interest in any of the lands acquired in Florida; that it suffered no loss; that defendant was in fact, not its agent but the agent of a former subsidiary "whose stock it has sold." It is claimed further by the defendant that the record shows from documents produced by the plaintiff and certain testimony of his witnesses, that the Investment Company formed a subsidiary known as the B. of L. E. Realty Company, a Florida corporation which paid out all of the money for the acquisition of the land including fees paid to the defendant and others wholly involved and that it, not the Investment Company, took legal title to the lands purchased.

It is true that the Investment Company formed a wholly owned subsidiary known as the B. of L. E. Realty Company under the laws of Florida which took the legal title to the

lands for which options had been originally acquired by the Investment Company. However, the Realty Company was not incorporated until Sept. 4, 1925 and it is a fact that prior to that time substantially all of the options involved in this litigation had been obtained and the option prices had been paid by the Investment Company. The entire cash payment of $250,000.00 on the Price contract, was made Sept. 2, 1925 and the prices for the other options had all been paid prior to the formation of the Realty Company. But issues of fact are raised in the evidence on the claim of the defendant that the Investment Company actually did not pay the defendant any money and that the Investment Company did not have an equitable interest in any of the lands acquired in Florida. An issue of fact also is raised on the claim of defendant that the Investment Company suffered no loss and the claim that the defendant in fact was not its agent but the agent of the Realty Company. On these issues the trial court held in favor of the plaintiff.

The record shows, by plaintiff's exhibits 47-a and 48-a that the Investment Company made two payments directly to the defendant, viz., $25,000.00 on July 20, 1925; $15,600.00 on August 6, 1925. These two payments were found by the trial court to be by way of reimbursement to defendant for cash payments advanced by him in the procurement of options for the benefit of the plaintiff and an examination of the exhibits shows a cashier's check of the Brotherhood of Locomotive Engineers Cooperative National Bank to A. E. Cummer in the sum of $25,000.00 dated July 20, 1925 and an accompanying memorandum with the legend: "The Brotherhood Investment Company, Cleveland, Ohio, Debit Account; option on Florida lands."

Exhibit 48-a is a check dated Aug. 6, 1925, signed by the Investment Company by Wm. B. Prenter, President and Geo. T. Webb, vice-president, payable to the order of the defendant in the sum of $15,600.00, and the accompanying memorandum of the Investment Company bears the following legend: "Debit Account, Option on Florida lands, draft by Geo. T. Webb, Aug. 6, 1925, payable to A. E. Cummer, $15,600.00." There is another notation with the legend, "Credit account B. of L. E. Bank, draft by G. T. Webb re Florida property $15,600.00."

Plaintiff's exhibit 65 is a memorandum of the Investment Company of a check to A. E. Cummer in the sum of $150,000.00 with the legend, "debit account, option Florida property," dated Sept. 5, 1925. The original check of $150,000.00 to A. E. Cummer dated Sept. 5, 1925, is not in the record and from the testimony adduced appears to have been

lost. There is credible evidence therefor to support the finding of the trial court that all of said payments were made directly to defendant by the Investment Company.

It appears from the record that when the time came to exercise the options which the Investment Company had acquired, .it was found that the Investment Company was not authorized by its charter to take title to lands in Florida and it was then that the Realty Company was organized and incorporated by the Investment Company for the express purpose of taking title to the lands in question. We find no evidence supporting or tending to support the argument of the defendant that the contract of defendant was with the Realty Company. On the contrary the evidence is clear and undisputed that the contract of employment of the defendant was with the Investment Company alone. The evidence clearly shows that the defendant was employed initially as the agent of the Investment Company to assist in the acquisition of lands deemed necessary to the development of the Florida project, at the meeting heretofore described which took place between the defendant and the members of the board of directors of the Investment Company in Cleveland on July 1, 1925.

It is conceded by way of brief of the defendant as follows:

"It is likewise clear that perhaps at the outset the Brotherhood Investment Company could claim as the sole stockholder of the B. of L. E. Realty Corporation that it had been deprived of money belonging to it by virtue of payments made by its subsidiary."

This being conceded, the question arises as to what happened after that time, which would divest the Investment Company of its right to claim that it had been "deprived of money rightfully belonging to it by virtue of payments made by its subsidiary," assuming for the purpose of discussion only that such is the fact.

It is argued by the defendant that the evidence is clear that since 1927 the Investment Company has not held any stock in the Realty Company having sold all of its stock to the Brotherhood of Locomotive Engineers and since that date has been only a creditor of the Realty Corporation which is still in receivership.

It is a fact that the Investment Company sold its stock in the Realty Corporation to the Brotherhood of Locomotive Engineers in 1927, but inasmuch as any right of action which the Investment Company had accrued in the summer of 1925, the question arises did it sell or otherwise dispose of any

claims or choses in action which it may have acquired against the defendant, arising out of the transactions of 1925?

The particular contract for the purchase of the Gill 170 acre tract, previously described, which resulted in a profit of some $72,000.00 to Blackburn and Gill and this defendant in equal shares was dated July 29, 1925. The Knight tract was under option on July 8, 1925; the Price tract was under option on July 10, 1925. The majority of the options for the purchase of Florida lands were taken in July and August, 1925, all of which was prior to the formation of the Realty Corporation. These facts support and emphasize the claim of the plaintiff that the defendant's contractual relationship was with the Investment Company. Consequently any violation thereof would be a breach of duty which the defendant owed to the Investment Company.

It must be conceded that the right of action of the Investment Company, if any it had, accrued in 1925 and even though the discovery of the alleged fraudulent conduct was not made until 1940, evidence is entirely lacking in the record to warrant the assumption that the Investment Company ever relinquished any claims which it may have had prior to or contemporaneous with or after its sale of the stock of the Realty Company in 1927.

We fail to see how the Realty Corporation which was merely a legal instrumentality organized and incorporated by the Investment Company to take title to the land, could have acquired any rights against the defendant superior to the Investment Company which had the contractual relations with the defendant. The Investment Company paid out the money for the options and either by its own action or through the Realty Company exercised the options by advancing all of the money necessary to purchase the lands. So far as the sale of the stock in the Realty Company to the International Brotherhood of Locomotive Engineers is concerned, if there was a claim on behalf of that organization to any rights by reason of the purchase of the Realty Company stock from the Investment Company, the Brotherhood of Locomotive Engineers would be the proper party to assert such a claim against the Investment Company. On this phase of the controversy we think it does not lie with the defendant to claim either that the Realty Corporation or the Brotherhood of Locomotive Engineers are the parties to assert any claims against him on the ground that either or both are the real parties in interest.

Now it is true, as the record discloses, that after the formation of the Realty Corporation, the Investment Company ad-

vanced certain sums to the Realty Corporation in the form of loans covering its expenditures in the acquisition of the Florida lands in question. These were bookkeeping transactions on the books of the Investment Company showing these advances to its wholly owned subsidiary. There is further evidence that for a time the interest was paid on these loans as evidenced by an entry of Sept. 30, 1925, viz., "interest on account to date, $3696.09." It appears to us these were bookkeeping transactions between the Investment Company and its wholly owned subsidiary which did not particularly concern the defendant, all of whose dealings were with the Investment Company.

The record shows conflicting evidence on the question of whether the Investment Company was ever paid for the advances made to the Realty Company. At pages 870 and 871 of the record appears the following testimony of the Receiver;

"Q. Now, you have stated on cross-examination that the Brotherhood Investment Company advanced toward these Florida lands, purchases, options, acquisitions of property and to the B. of L. E. Realty Company something over $4,000,000.00?

"A. Oh, yes.

"Q. And what, if anything ever came back to the Investment Company by way of cash to reimburse you?

"A. Nothing. There were a lot of negotiations in the form of mortgages, and this and that, small, but there was no direct bearing on the account.

\*      \*      \*      \*

"Q. What was the outstanding indebtedness of claims filed with you as receiver from general creditors?

"A. I think it ran three or four million dollars.

\*      \*      \*      \*

"Q. Mr. Hey, nothing ever came back? $900,000 came back in cash from the Brotherhood of Locomotive Engineers, didn't it?

"A. Yes, if you care to put it that way, I suppose.

"Q. Weren't any payments ever made by the Brotherhood— the BLE Realty Corporation?

"A. No.

"Q. Not even a penny?

"A. No, sir. As you can understand, considerable negotiations and mortgages and things like that, but I can't—it is impossible to describe all the details of those transactions, but there was no—

"Q. Money was never transferred from the BLE Realty Corporation to the Brotherhood Investment Company?

"A. No money was directly paid on those obligations; we have accumulated $4,000,000 of obligations."

With this, and other evidence before the trial court, the issue of fact was determined by the trial court in favor of plaintiff. We cannot say that such determination was contrary to the manifest weight of the evidence.

There is other evidence on this issue worthy of notice which is that the defendant himself, through Mary B. Blackburn, in the case of Mary B. Blackburn v. Wimmers, Rec'r, et al No. 4121 Florida Circuit Court for Sarasota County, commenced Dec. 11, 1936, was successful in breaking down and piercing through the separate corporate entity of the Realty Corporation. In that case, the plaintiff, Blackburn, who was representing the interests of the defendant as well as her own, prayed, "that the court disregard the corporate entity of the Brotherhood of Locomotive Engineers Realty Corporation." Having himself asked a court of equity to disregard the separate entity of the Realty Corporation to enable him and his associates to recover a judgment against the Brotherhood of Locomotive Engineers and in this suit to sustain a defense on the technical ground that the Realty Corporation is a separate corporate entity to whom any claim owing by him should be paid, is highly inconsistent and certainly not in accord with the rules and principles of equity.

There is another proposition which challenges the attention of this court and that is that in this same case the defendant had filed his cross-petition against the Receiver of the Investment Company on the basis of a contract signed "Brotherhood Investment Company, per Geo. T. Webb, Vice-president." In its pleading he sets forth "that said agreement further provides that in payment for such services the Brotherhood Investment Company agreed to pay to this defendant an over-writing commission on the gross sales of land in Sarasota County, Florida, made by it, or **any subsidiary corporation owned or** controlled by it * * *." And in the prayer of the cross-petition the defendant prays for an order directing plaintiff to disclose and to divulge to defendant the gross amount received by the Investment Company, **its subsidiary,** their successors or the plaintiff, from the sale of land owned by the Investment Company, **its subsidiaries,** their successors and the plaintiff in Sarasota County Florida. (Emphasis ours.)

In view of the position taken by the defendant in this litigation when claiming on the contract pleaded in his cross-petition, it cannot be successfully maintained that the Realty Company became the real party in interest, either by way of

substitution or novation. This becomes manifest upon an examination of all of the evidence in the case. This proposition is also implicit in the argument of defendant in support of his claim for recovery on his cross-petition for in his reply brief defendant argues that the beneficiary of the contract in question is the Investment Company; that it wanted to see its subsidiaries prosper; that if they prospered, naturally the Investment Company, as their parent, would prosper and that on Sept. 5, 1925, when this agreement was delivered, every bit of profit of the Realty Company would have eventually come to the Investment Company as its sole stockholder.

Furthermore, the claim of plaintiff is implicit in the pleadings and the evidence that defendant presented a claim based upon the over-writing contract to the plaintiff, receiver, in April, 1935, and it is conceded by the defendant that any claim under this over-writing contract should be set-off by its accounting of profits and commissions derived from the purchase and sale of the Florida lands. Therefore, it appears throughout this proceeding that defendant at all times recognized the Investment Company as his principal to whom he owed certain contractual obligations as agent and from whom he claims certain rights based on his contractual relations as agent.

In view of the position taken by defendant, he cannot now repudiate his position as agent of the Investment Company, and claim that if any funds are due and owing from him, some one other than his principal is entitled to them. In other words, defendant, by his course of conduct in relation to these transactions is estopped from denying that the plaintiff is the real party in interest.

"As a broad general rule, only a party or one in privity may enforce a contract. It is thoroughly established as a general rule that privity of contract is an essential element of a cause of action thereon, and since the obligations and duties arising out of a contract are due only to those with whom it is made, only one who is a party to the contract, or * * * one who is in privity may bring an action thereon for its breach or sue thereon in a direct proceeding in equity." 17 C. J. S. Sec. 518. Actions.

In the instant case the contract was for personal services of a highly confidential nature and there is nothing in the record to show that the privity of contract between the Investment Company and the defendant was changed in any manner whatsoever.

Plaintiff calls attention to the test as adopted by the Court of Appeals of the Fifth District of Ohio, to determine the real party in interest, as set forth in the case of **Lyons v. Chapman, 40 Oh Ap 1 (1931)** as follows:

"We believe that the proper test to determine who is the real party in interest is ascertainable from an answer to the question: Who would be entitled to the demages?"

Applying this test to the facts of the instant case the Investment Company is the one which would be entitled to damages and is therefore the real party in interest.

It therefore seems to us that the judgment of the trial court was sound in determining that the Investment Company, through its receiver, to whom the defendant owed the duty of absolute fidelity, was and is the real party in interest. This right accrued as we have heretofore stated in 1925. It cannot logically be said that this right was lost either by the transactions whereby the Investment Company sold its entire stock in 1927 without selling its claim against the defendant, nor by the fact that title to the properties was taken in the name of a separate corporate entity (B. of L. E. Realty Corporation) wholly owned and controlled by the Investment Company after the time the cause of action herein accrued.

We think we have covered this situation sufficiently to indicate that the finding of the trial court that plaintiff is the real party in interest is sound and must be sustained.

We shall now proceed to consider the third question presented above, namely; was there a breach of any fiduciary relationship?

In arguing this question the defendant contends that the finding of the trial court that the defendant was employed as a confidential agent and advisor to acquire and accumulate the land in Florida, is manifestly against the weight of the evidence and that the correct finding should have been that the defendant was that of a middleman or a "go between." It is argued that in such capacity he was entitled to participate in distributions made by plaintiff's witness, Blackburn, especially since it appears that the distributions made by Blackburn were in accordance with the undisputed and customary practice then existing in Florida. Counsel for defendant cites and quotes numerous authorities to the effect that the general rule against representation of adverse interests by an agent has no application where a person is employed as a middleman for the sole purpose of bringing parties to-

gether to enable them to make their own bargain. While the general rules of law urged by the defendant are indeed applicable where a person is employed only as a middleman we are of the opinion that such legal principles are not available to the defendant under the facts shown by the record in this case. In our discussion of the question of the application of the statute of limitations we have touched upon certain phases of the question here presented.

In our opinion there is ample evidence in the record to support the finding of the trial court that the relationship of principal and agent existed between the contracting parties. The fact that defendant was paid outright the sum of $150,000.00 for his services, that it was the avowed intention of the parties that the transactions should be conducted secretly and confidentially to prevent any leakage of information to the general public and particularly to the owners of Florida lands that the Brotherhood Investment Company was intending to purchase such lands, the admissions of the defendant himself concerning his relationship with the Brotherhood Investment Company and his contention here that the investment company through its officers had knowledge of his arrangement with Blackburn to divide or split commissions, all tend to support the proposition that the defendant was indeed the confidential agent for the investment company in its acquisition of Florida lands. This conclusion is further fortified by the testimony of Webb who testified that the defendant himself said that he could get commissions of sales but that he could not take them without knowledge and consent of the officers of the Investment Company. There can be no doubt therefore that the defendant was not a middleman but on the contrary was the paid confidential agent of the investment company to which under well settled principles of law he owed the obligation of the highest loyalty and absolute fidelity.

It is our conclusion that the defendant was not acting as a middleman and that the trial court did not err in deciding this issue contrary to defendant's contention.

We proceed now to a consideration of the fourth question above stated, namely, "Is the defendant entitled to recover on his cross-petition?"

In his cross-petition defendant alleges the execution of a written agreement on the 5th of September, 1925, whereby the Investment Company for and on behalf of its allied corporations, agreed in consideration for counsel, advice and assistance in the development and disposal of the properties of the Brotherhood in Sarasota County, to pay the defendant an over-writing commission on the gross sales of five per-

cent (5%) and that by the terms of said agreement it was understood that the defendant was not required to take an active part in the business of the Brotherhood but was to hold himself available for all assistance in the way of advice and counsel for which he might be called upon.

It is the contention of defendant that "he is entitled to recover on his cross-petition in the sum of $228,106.80, the same being five per cent of the gross sales of real estate acquired by the Investment Company in Florida, totalling $4,476,866.00, such judgment, however, to be reduced by the amount received by the defendant from the sellers of the land in accordance with the agreement of the defendant with Mr. Webb which would leave a net balance due defendant of $157,803.57   It is claimed by defendant that the failure of the trial court to enter judgment in his favor constitutes such error as to require this court to remand this case for a new trial.

It is the further claim of defendant that the record contains no evidence whatsoever to deny the validity of the execution of the document and that the plaintiff does not deny that the service in the development and sale of the property acquired was rendered by the defendant.

The plaintiff argues that the document is so loosely drawn and so vague within its four corners as not to be considered worthy of the term "contract."  The plaintiff further claims that the action on the contract is barred by the fifteen year statute of limitations, the statute having been pleaded by plaintiff in his answer to the defendant's cross-petition; that said cross-petition was filed on Oct. 2, 1941, being sixteen years and twenty-seven days after the date of the contract.

It is further argued by plaintiff in substance that the term "Brotherhood' as used in the contract must refer either to the Brotherhood of Locomotive Engineers or to the Brotherhood Investment Company, neither of which corporation actually owned any land in Florida on which commissions could be charged.

At the trial of the case, the plaintiff produced a handwriting expert to show that the signature of the defendant was not attached to the agreement at the time of its execution but was attached approximately ten or twelve years prior to the time of the trial.  Insofar as this testimony is concerned, we think it is immaterial because under §8621 GC, commonly referred to as the "Statute of frauds" it is necessary only that the memorandum or agreement in writing be signed by the party to be charged therewith or some person thereunder lawfully authorized.

We think the most important defense entered by plaintiff to this contract is that it was neither brought to the attention of the board of directors of the Investment Company, nor the executive committee of the Investment Company and that the vice-president, Geo. T. Webb, was without authority to bind the corporation to such an agreement.

While it is true that Mr. Webb who signed the document stated that he talked to Mr. Prenter, the then president of the corporation, and that Mr. Griffing stated to him that they thought that such an agreement would be proper there is no evidence showing or tending to show that the contract was ever brought to the attention of the Board of Directors or the Executive Committee. Consequently, there is no evidence that the contract was ever authorized or in any way ratified by the Board of Directors or the Executive Committee of the corporation.

This particular document purports to grant to the defendant an overwriting commission of five percent on gross sales of the properties of the "Brotherhood" in Sarasota County, Florida, without right of cancellation until commissions amounted to $100,000.00.

It will be noted that the defendant is not required to expend any effort himself in the sale of these properties nor is he required to take any "active part in the business of the Brotherhood" but is only "to hold himself available for all assistance in the way of advice and counsel when he may be called upon." When it is considered that under this document the defendant claimed the minimum sum of $100,000.00, against the Receiver in 1935 and in this action claims a maximum sum of $228,106.80 it is obvious that a most serious commitment was attempted to be made binding the corporation to pay to the defendant large sums of money merely for "advice and counsel" and this only upon the claimed authority of a vice-president. Apparently, there was only one copy of this purported "Contract" and that was retained in the possession of the defendant alone, having been delivered to him in Florida by Webb. No record of this so-called "contract" was made anywhere or in any manner in the minutes of the corporation nor was a copy of the document placed on file with the corporation.

It is a fundamental proposition of law that the board of directors is the governing body of the corporation unless there is express delegation of powers to ministerial officers or an executive committee. A vice-president of a corporation, by virtue of his office, has only such authority to represent or bind a corporation by contract as has been properly conferred upon him. The authority of a vice-president to

bind a corporation in a matter as serious as that considered here, certainly is not inherent in him by virtue of his office. It is, of course, possible to grant general or specific powers to a vice-president to bind the corporation, but no such power was granted in this case and in the absence of either express or implied authority, the vice-president of the corporation was entirely lacking in power to bind the Investment Company to the contract in question.

Furthermore, there is no evidence in the record in this case which would indicate that the corporation is estopped to deny the existence of such powers in its vice-president.

It is rather a strange circumstance, which apparently weighed heavily in the decision of the trial court, that no claim was made under this agreement until the year 1935, when the Investment Company was in the hands of the receiver. This claim was then made against the receiver in the minimum sum of $100,000.00 and was, at that time, rejected by the receiver. No further effort was made by defendant to realize upon any claims under this document until the instant suit was brought by plaintiff in 1941, at which time claim was made for the maximum sum designated by the instrument.

As previously noted, it is conceded by defendant that any claims under the so-called over-writing contract were to be offset by an accounting of his profits derived from his transactions as agent in the acquisition of the Florida lands for the benefit of his principal. By his unexplained conduct in failing utterly and completely to make any such accounting of his profits and commissions, even when he made his first claim against the receiver in 1935, he forfeited any right which he may have had in a court of equity to recover on his cross-petition for "advice and counsel" under the contract sued upon.

It is the view of this court that the burden of proof was upon defendant to prove his right to recover under the contract by a preponderance of the evidence. It seems to us the failure of proof that Webb was authorized to bind the corporation, or its allied corporations, to a document of this importance, and the failure of the defendant to make an accounting, as he was required to do, are alike fatal to the claims of the defendant, under the contract in this action. In view of these conclusions, we think it unnecessary to discuss the statute of limitations urged as a defense by the plaintiff.

In our opinion, therefore, taking into consideration all of the facts and surrounding circumstances, the judgment of the trial court must be sustained in holding against the right of the defendant to recover on his cross-petition.

We proceed now to a consideration of the judgment rendered by the trial court. We have heretofore stated that in respect of the claim for commissions, as distinguished from secret profits, the plaintiff is not entitled to a recovery because of the bar of the statute of limitations, the uncontradicted evidence showing that the responsible officials of the company had knowledge of and approved these transactions. On the other hand, we have heretofore stated, that the same rule does not apply to the secret profits gained by the defendant through acquiring an interest adverse to that of his principal, the discovery of which did not occur until the year 1940.

Referring again to the transaction covering the Gill 170 acre tract, the total profit was $72,250.00 of which the sum of $53,361.11 was paid without suit. Of this sum the defendant received one-third or $17,787.03, which the plaintiff is entitled to recover with interest at six percent from November 14, 1927, to the date of the judgment rendered by the Common Pleas Court on Dec. 29, 1948, viz., $22,545.11 or the total sum of $40,332.14.

In relation to the same transaction, a recovery was had in the case of Blackburn v. Wimmer, (No. 4121 Sarasota County, Florida, supra) on the third Gill note in the sum of $18,888.89 of which defendant collected one-third. or the sum of $6296.30 which plaintiff is entitled to recover with interest at six percent from October 6, 1943 to the date of the judgment rendered by the trial court, viz., the sum of $1975.99, or the total sum of $8272.29.

It appears that the judgment of the trial court allowing recovery of $150,000.00 with interest from Sept. 5, 1925, to the date of judgment was predicated upon the prayer of the petition for an accounting and "such other and further relief as may be just and equitable in the premises and to which in law or equity he may be entitled," there being no prayer in the amended petition for the recovery of this or any other specific sum of money.

The authorities here and elsewhere are unanimous on the proposition that an agent owes the duty of exercising the utmost fidelity, good faith and loyalty and although he may gain a profit with the knowledge and consent of his principal, he may not acquire an interest adverse to that of his principal and thereby reap a secret profit at his, the principal's, expense. This proposition of law is most succinctly stated in Mecham on Agency, (2d Ed.) Vol. 1 Sec. 1188, page 867 as follows:

"Loyalty to his trust is the first duty which the agent owes

to his principal. Without it, the perfect relation cannot exist. Reliance upon the agent's integrity, fidelity and capacity is the moving consideration in the creation of all agencies; in some it is so much the inspiring spirit, that the law looks with jealous eyes upon the manner of their execution and condemns not only as invalid as to the principal, but as repugnant to the public policy, everything which tends to destroy that reliance."

To the same effect see: Restatement of the Law, Agency, Sec. 391, pages 882 et seq.; 1 O. Jur. Sec. 84, Agency, pages 761 et seq.; 3 C. J. S. Agency, Sec. 138, pages 6, 7, et seq.

"The general interest of justice and the safety of those who are compelled to repose confidence in others, alike demand that courts shall always inflexibly maintain that great and salutary rule which declares that an agent to sell cannot make himself the purchaser, nor, if employed to purchase can he be himself the seller."

Sec. 1190, Mecham on Agency (2d. Ed) Vol. 1, page 868 which is quoted from the case of Porter v. Woodruff, 36 N. J. Equity, 174.

These rules of law apply to this transaction where the defendant with two others purchased the Gill tract and then sold to his principal at an immense profit to himself and others as hereinbefore described.

What then is the remedy where the agent has profited secretly at the expense of his principal, when placing himself in a relation antagonistic to the interest of his principal? Is it merely the recovery of the secret profits? By the great weight of authority a court of equity may require the agent not only to surrender to his principal such profits but he will likewise be denied the right of compensation for his services to which he would otherwise be entitled.

This proposition of law is well stated in the case of Murray v. Beard, 102 N. Y. 505, and quoted with approval by Crane, C. J., in the case of Lambdin v. Broadway Surface Adv. Corp. 272 N. Y. 133 as follows:

"An agent is held to uberrima fides in his dealings with his principal, and if he acts adversely to his employer in any part of the transaction or omits to disclose any interest which

would naturally influence his conduct in dealing with the subject of the employment, it amounts to such a fraud upon the principal as to forfeit any right to compensation for services. (Story on Agency, Sec. 31, 334; Story's Eq. Jur. Sec. 315; Elwell's Evans on Agency, 268; Dunlap Paley on Agency, 105, 106; Carman v. Beach 63 N. Y. 97, 100). It is an elementary principle that an agent cannot take upon himself incompatible duties and characters, or act in a transaction where he has an adverse interest or employment. (N. Y. Cent. Ins. Co. v. Nat. Prof Ins. Co. 14 N. Y. 85; Elwell's Evans on Agency, 14; Greenwood v. Spring, 54 Barb. 375; Neuendorff v. World Mut. Ins Co. 68 N. Y. 389.)"

The first paragraph of the syllabus of Lambdin v. Broadway Surface Adv. Corp. 272 N. Y. 133, covering the same subject, is as follows:

"1. An agent or employee of another is prohibited from acting in any manner inconsistent with his agency or trust and is at all times bound to exercise the utmost good faith and loyalty in the performance of his duties. Not only must he account to his principal for secret profits, but he also forfeits his right to compensation for services rendered by him if he proves disloyal."

To the same effect are the cases of Perry v. Engel, 296 Ill. 549; Coal Co. v. Hedrich, 91 W. Va. 377; Little v. Phipps, 208 Mass. 331; Quinn v. Phipps, 93 Fla. 805; Sutherland v. Guthrey, 86 W. Va. 208. The rule stated in these cases seems to be a well established principle of law supported by courts and text writers and we have not been cited to nor do we find any authorities contra.

Therefore, for the reasons stated we find that the trial court did not err in allowing recovery of the sum of $150,000.00 paid to the defendant on Sept. 5, 1925.

This brings us to another consideration and that is the question of interest allowed on this sum which was far in excess of the principal amount when computed from Sept. 5, 1925 to the date of the judgment. The journal entry of the trial court discloses that the court allowed this sum on the ground that plaintiff had sustained damages in the sum of $150,000.00 and computed interest thereon from the date of the payment to the date of the judgment. In our opinion it was prejudicially erroneous to the rights of defendant to include interest for a period

preceding the date of the judgment. We reach this conclusion for a number of reasons. So far as we are able to determine from the record, there was no demand for the return of this sum prior to suit and when the petition was filed in 1941 there was no prayer for the recovery of this specific sum, except insofar as the same could be inferred from the general plea for accounting and equitable relief contained in the petition.

The petition shows that the plea for an accounting relates specifically to the secret profits and commissions. It did not relate to the sum of $150,000.00 which had been voluntarily paid to defendant by plaintiff for the services rendered by defendant. Nor is it denied that he performed the services for which he was employed. And were it not for his conduct in acquiring an interest antagonistic to his employer and profiting secretly thereby, the plaintiff would not have been entitled to any recovery. The denial or recovery of compensation for services performed is not in the nature of damages but is rather a penalty imposed for unfaithful performance under a doctrine of public policy respecting the law of principal and agent. As stated in Sutherland v. Guthrey, supra:

"They (the agents) could not speculate with their principal's property for their own benefit and this is not upon the principle that the owner of the property is damaged, and has not received as much as he is willing to take, but is based upon that other principle requiring those standing in the relation of principal and agent, or in any other position of trust, to act with the utmost good faith toward those whose business they are charged with conducting. * * * To allow them to receive the commission provided by the contract, even when their fraud and breach of faith has been discovered, would put no penalty upon such conduct. No agent would be deterred by the consequences of his act from utterly disregarding the rights and interests of his principal. If the agent knew that no penalty would be visited upon him after his perfidy was discovered, there would be no motive for him to deal honestly except that which might be dictated by his own moral sense, and unfortunately in our human relations, this deterrant has not been found sufficient to prevent those engaged in business from resorting to ways devious in their nature for the purpose of securing improper advantages of those who have entrusted their property and interests to them. The policy of the law is to put the faithful honest servant in a little different class from the one who has been unfaithful to

his trust, and it seems to be uniformly held that where an agent so manages his principal's business as to secure to himself profits or advantages to which he is not entitled under his contract of agency he will. not only be required to surrender to his principal such advantages but he will likewise be denied the right to receive the compensation to which he would have been entitled had he been honest and faithful in the performance of his duties. It may be said that the result of this doctrine would be to deny compensation for work actually performed, and such is the case, but it is also true that when one placed in the position of an agent takes the chance of deceiving his principal, and securing a larger part of the profits than he is entitled to, he must be willing to forfeit, in case he is discovered, even that to which he would otherwise be entitled."

Inasmuch then, as the return of this sum previously paid as compensation for services rendered was not put in direct issue by the pleadings and because under the law the recovery of the compensation in addition to the secret profits is in the nature of a penalty or punishment on grounds of public policy, we conclude under all of the facts and circumstances of the case that interest on this sum should be computed only from the date of the judgment.

Therefore, the judgment of the trial court will be modified in accordance herewith, and as modified, affirmed. A journal entry may be prepared in conformity herewith. Exceptions noted.

SKEEL, PJ, McNAMEE, J, concur.